In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1302

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER L. LARANETA,

*Defendant-Appellant.*

AMY and VICKY,

*Intervenors*.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:10-cr-00013-RL-PRC-1—**Rudy Lozano**, *Judge*.

ARGUED OCTOBER 1, 2012—DECIDED NOVEMBER 14, 2012

Before POSNER, WILLIAMS, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant pleaded guilty to seven counts of violation of federal child pornography laws, 18 U.S.C. §§ 2251(d)(1), 2252(a)(1), (a)(2), (a)(4), and was sentenced to 30 years' imprisonment, to be followed by supervised release for the rest of his life, and also to pay restitution to two women, referred to

pseudonymously as Amy and Vicky, in the amount of $3,367,854.00 and $965,827.64; pornographic images of them, as girls, were found in the defendant's possession. The amount awarded Amy is identical to the amount she has requested, and usually been awarded, in literally hundreds of other criminal cases involving pornographic images of her. But the amount the judge ordered the defendant to pay Vicky subtracts the restitution that she has collected from other defendants. The appeal challenges the length of the defendant's sentence and the amount of restitution that the judge ordered him to pay. The government defends the sentence but not the restitution award, and also challenges our allowing Amy and Vicky to intervene in this appellate proceeding; and let's start there.

There is no counterpart in the federal rules of criminal procedure to Rule 24 of the civil rules, which explicitly authorizes, and regulates, intervention. But the civil rules do not exhaust the procedural authority of federal judges. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991), lists a variety of inherent powers of a federal court, including power to "impose silence, respect, and decorum," "control admission to its bar," "discipline attorneys," "punish for contempts," "vacate its own judgment upon proof that a fraud has been perpetrated upon the court," "conduct an independent investigation in order to determine whether it has been the victim of fraud," "bar from the courtroom a criminal defendant who disrupts a trial," "dismiss an action on grounds of *forum non conveniens*," and "act *sua sponte* to dismiss a suit for failure to prosecute." In *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010), we added that

"motions to reconsider (in district courts) and petitions for rehearing (in courts of appeals) are ordinary elements of federal practice that exist in criminal prosecutions despite their omission from the Rules of Criminal Procedure."

Although in *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL-CIO, Local 283 v. Scofield*, 382 U.S. 205, 217 n. 10 (1965), the Supreme Court left open the question whether there is inherent power to allow intervention at the appellate level, we answered the question in the affirmative long ago, see *Hurd v. Illinois Bell Tel. Co.*, 234 F.2d 942, 944 (7th Cir. 1956), and other courts have joined us. See *In re Grand Jury Investigation Into Possible Violations of Title 18, U.S. Code, Sections 201, 371, 1962, 1952, 1951, 1503, 1343 & 1341*, 587 F.2d 598, 601 (3d Cir. 1978); *United States v. Bursey*, 515 F.2d 1228, 1238 n. 24 (5th Cir. 1975). Intervention has even been permitted in district court cases in which the conditions for intervention in Rule 24 were not satisfied. *Missouri-Kansas Pipe Line Co. v. United States*, 312 U.S. 502, 505-06 (1941); *Textile Workers Union of America, CIO v. Allendale Co.*, 226 F.2d 765, 767-68 (D.C. Cir. 1955) (en banc).

We therefore consider the question whether to allow victims of crime to intervene in criminal proceedings (rather than merely to be heard, a right granted them by the Criminal Victims' Rights Act, 18 U.S.C. § 3771(a)(4)) to be one of expedience rather than of power. Yet even if a right to intervene in criminal cases were limited to victims who like Amy and Vicky have a financial

stake because they have a colorable claim to restitution, it would be a mistake to allow intervention at the district court level. That would be a recipe for chaos. Imagine plea bargaining in which intervening crime victims argue for a different bargain from that struck between the government and the defendant, or trials at which victims' lawyers present witnesses and cross-examine the defendant's witnesses or participate in the sentencing hearing in order to persuade the judge to impose a harsher sentence than suggested by the prosecutor.

The complications of intervention are many fewer at the appellate stage, where participation is limited to filing briefs and, at the appellate court's discretion, participating in oral argument, which we permitted in this case. The Criminal Victims' Rights Act allows a crime victim whose claim of restitution is denied to seek mandamus in the court of appeals, 18 U.S.C. § 3771(d)(3), but makes no provision for participation by a victim who has been successful in the district court. Suppose the government declines to defend the restitution award when the award is challenged by the defendant in his appeal from his sentence. The case for intervention is most compelling when a person has a direct financial stake in a case and cannot be certain that any party has an interest in defending that stake. The government has no financial stake in restitution to victims of crime. And judicial power to allow intervention at the appellate level can be exercised in a case such as this without causing the problems that intervention in

the district court would cause—indeed without causing any problems at all that we can see.

The statutory provision entitling a victim of crime to seek mandamus if restitution is denied strengthens our conclusion. If we reversed the award to Amy and Vicky and directed the district court to vacate it, they could then seek mandamus, and if we denied it they could ask the Supreme Court to review the denial. Allowing them to participate at this stage of the appellate process avoids a second trip to the appellate courts, and also ensures that they'll be "able to present their arguments on the issues to a reviewing court which has not crystallized its views." *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL-CIO, Local 283 v. Scofield*, *supra*, 382 U.S. at 213. Participation as amici curiae would not be an adequate substitute, for as nonparties they could not seek rehearing or rehearing en banc or review by the Supreme Court, should our decision go against them.

We are mindful of the Eleventh Circuit's holding in *United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301, 1306 (11th Cir. 2012) (per curiam), that a crime victim cannot appeal from a denial of restitution in a criminal case because the victim is not a party, and the district court cannot make the victim a party, thus enabling him or her to appeal, by allowing the victim to intervene. We have no quarrel with that result, because, as we have just said, we do not think a crime victim should be permitted to intervene in the district court. Our case is different. The crime victims, having prevailed in the

district court, are not trying to appeal. They are seeking only to intervene in this court and only to defend the award they received in the district court. Whether intervention at the appellate level only is permissible was not an issue in the Eleventh Circuit's case.

We begin our discussion of the merits of the defendant's appeal with his challenge to the length of the prison sentence. The maximum prison sentence for any of the first six offenses (offenses of receiving, distributing, and transporting child pornography) to which he pleaded guilty was 20 years. The judge ordered the sentences for these six offenses to run concurrently. It was only by making the sentence for the seventh offense—possession of child pornography, an offense for which the maximum sentence is 10 years, 18 U.S.C. § 2252(b)(2)—consecutive to the other sentences that the judge jacked up the defendant's prison term to 30 years. This was nevertheless a below-guidelines sentence. The guidelines sentence would have been life imprisonment (though it could not have been imposed, because it would have exceeded the statutory maximum), in part because of the "pattern of activity" guideline, U.S.S.G. § 2G2.2(b)(5), which increases the base offense level by five points if the defendant "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." Application Note 1 amplifies the definition to cover "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." The district judge ruled that the government had proved that

the defendant had engaged in a pattern of such activity, and that ruling was not clearly erroneous.

But the defendant complains that the pattern of activity guideline allowed, or more precisely encouraged, the judge to make the length of imprisonment as long as possible by invoking criminal conduct for which the defendant had never been convicted. That is true, but merely illustrates the unexceptionable general proposition that conduct relevant to the crime of conviction can be considered in calculating a sentence even if that conduct did not result in a conviction. See, e.g., *United States v. Watts*, 519 U.S. 148, 156-57 (1997) (per curiam). All that the sentencing guidelines do is create suggested (no longer mandatory) sentencing ranges inside the statutory ranges, and it is proper to vary the interior ranges in light of other criminal conduct by the defendant that is related to the conduct for which he's been convicted, even if that other conduct, because it did not result in a conviction, is not counted as criminal history in the criminal-history tables that also influence guidelines ranges. Other acts of sexual predation by a defendant convicted of sexual predation have predictive significance with regard to the likelihood of recidivism, and likelihood of recidivism is an uncontroversially relevant consideration in deciding how long a defendant should be incapacitated (by being imprisoned) from committing further crimes, provided of course that the sentence does not exceed the statutory maximum.

Relevant conduct also bears on the length of sentence that is necessary to deter others (more realistically,

some others; if deterrence were fully effective, there would be no crime) from committing the same crime as the defendant. Suppose a defendant committed twenty serious sex crimes but has been convicted only of the one for which he's being sentenced. A long sentence is appropriate to remind him and others that even if sexual predators get away with their crimes most of the time, if they're caught their other crimes (if discovered) will figure in their sentences and so will be at least indirectly punished—and indirect punishment is better than no punishment.

The defendant further complains that the judge should not have given him a consecutive sentence for the offense of possession. Consecutive sentencing for independent crimes (as distinct from consecutive sentences for "a single crime, procedurally proliferated"—that is, where "morally the transaction was a single wrong, to be expiated by a single punishment," *United States ex rel. Mignozzi v. Day*, 51 F.2d 1019, 1021 (2d Cir. 1931) (L. Hand, J.)) is proper because the effect of a concurrent sentence is to reduce or wipe out a sentence for a crime of which the defendant has been convicted. Had the judge made the defendant's 10-year sentence concurrent with his 20-year sentences, the 10-year sentence would have been nullified. "Would it not be absurd, to make one imprisonment a punishment for two offences?" *Russell v. Commonwealth*, 7 Serg. & Rawle 489, 1882 WL 13700, at *2 (Pa. 1882). Absurd or not, it is not required.

The defendant's remaining challenges to the prison component of his sentence are well-nigh frivolous. They

are that his sentence punishes him more harshly than similar offenders and even than criminals who commit more serious, because violent, offenses, and that viewing child pornography does not prove that the viewer has a sexual interest in children. The district court addressed and rejected both challenges, the first because the disparities were, as he was entitled to rule, "overridden by the seriousness of the offense." And remember that the defendant's sentence, though long, is a below-guidelines sentence.

The second challenge we barely understand. We can imagine a person who chanced on a pornographic image of a child looking at it out of curiosity; and of course police officers, lawyers, and judges, in a prosecution involving child pornography, will view child pornography without being expected to find it sexually arousing. But the defendant doesn't fall into any of these classes of innocent viewers; anyway he had revealed in chat logs introduced in evidence his interest in engaging in sexual acts with children. And the district court's finding that the defendant's involvement with child pornography was part of a pattern of sexual abuse was based on evidence of his having sexually abused children physically, rather than just by possessing or distributing images of them.

The restitution component of the defendant's sentence, to which we now turn, presents more difficult issues than the prison component. 18 U.S.C. § 2259(a) provides that "the court shall order restitution for any offense under" chapter 110, the chapter in Title 18 in which

one finds the federal criminal laws against sexual exploitation and abuse of children, and the order "shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the court." 18 U.S.C. § 2259(b)(1).

Amy was 8 years old when she was repeatedly raped by her uncle, who photographed the rapes, and other forced sexual acts that he committed against her, in order to create child pornography, which was widely disseminated online. Vicky was 10 when she was first raped, and images of rapes of her that were committed over a two-year period were also widely disseminated online. Altogether tens of thousands of pornographic images of Amy and Vicky have circulated on the Internet. The losses for which the two women (for they are now adults) sought and received restitution in the district court included incurred and expected costs of therapy, lost (and expected to be lost) income because of psychological damage that impairs their ability to work, and other items, all within the specific statutory definitions (of which more shortly) of victims' compensable losses. Amy traces all her losses to psychological damage caused by her learning that pornographic images of her had been widely disseminated. She says that she had recovered from the psychological damage imposed by the rapes themselves but relapsed when she learned about the dissemination. Vicky attributes her lost income to "hypervigilance" triggered by the dissemination of pornographic images of her, and her psychologist has opined

that her continuing need for counseling is attributable to the rapes as well.

The judge assessed Vicky's loss as $1,224,697.04, but because she had already recovered $258,869.40 from other defendants, he ordered the defendant to pay only the unpaid balance of $965,827.64. Yet as we noted he awarded the entirety of Amy's losses, calculated at $3,367,854, even though her lawyer acknowledges that she has already recovered about half those losses. The lawyer should have specified the entire amount recovered and the district court should then have subtracted that amount, as he did with Vicky.

The defendant does not question the judge's calculation of Amy's and Vicky's losses. But he denies that he's responsible for those losses, or at least for all of them that remain unpaid. Images of Amy and Vicky were found on his computer, true, but he was only one of an unknown number of viewers. Although he was found guilty of distributing child pornography, there is no evidence referred to in the presentence report—and the judge made no finding—that he distributed any of the images involving Amy or Vicky. The government in a post-argument submission, however, argues that there is evidence in the record that some of the images uploaded by the defendant may have been of the two girls.

Amy and Vicky argue that it doesn't matter because the statute, as we noted earlier, makes the defendant liable for the "full amount of the victim's losses," and it is that full amount that the judge computed; for he made no effort to estimate the loss attributable to the defendant's

viewing of pornographic images of the two girls. They acknowledge that the defendant is liable only for losses traceable to his crime, cf. 18 U.S.C. § 2259(c), but they deny that the defendant's crime has to have been a "proximate cause" of those losses.

The statute defines "full amount of the victim's losses" as the costs incurred by the victim for—

> (A) medical services relating to physical, psychiatric, or psychological care;

> (B) physical and occupational therapy or rehabilitation;

> (C) necessary transportation, temporary housing, and child care expenses;

> (D) lost income;

> (E) attorneys' fees, as well as other costs incurred; and

> (F) any other losses suffered by the victim *as a proximate result of the offense*.

18 U.S.C. § 2259(b)(3) (emphasis added). Amy and Vicky argue that only the losses specified in the last subsection—"any other losses"—are subject to a "proximate cause" limitation. They rely in part on the "canon of construction" (rule of interpretation) known as the "last-antecedent" canon, which says that a qualification in the last term of a series should be confined to that term. *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Another canon, however, the "series-qualifier" canon, contradicts the "last-antecedent" canon; it provides that a modifier at the beginning or end of a series of terms modifies all

the terms. *Porto Rico Railway, Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920).

The modifier "proximate cause" appears at the end of the series in subsection (b)(3), so either canon could apply to it; we don't know how to choose between them. Fortunately we don't need to choose; for however "proximate cause" might be thought to qualify a defendant's liability for "any other losses," there would be no rational basis for omitting that qualification from the specified losses (medical services, therapy, lost income, etc.). All that the inclusion in section 2259(b)(3) of "any other losses" does is close loopholes that might open up because of the detailed specification of losses in the preceding subsections; there is no reason that any limitation on liability imposed in the name of "proximate cause" should not apply equally to the specified and the unspecified losses. Illustrative of "any other losses" are the "costs related to schooling (school supplies, travel allowances, uniforms, the costs of food and snacks)" for a "program for alternative learning that would allow the child victims to receive some type of education" because they had previously "stopped attending school altogether after their ordeal," involved in *United States v. Doe*, 488 F.3d 1154, 1159, 1161-62 (9th Cir. 2007), and the costs incurred by guardians who took custody of the child victims of making necessary renovations to house them, and of transporting them to and from school, involved in *United States v. Searle*, 65 Fed. Appx. 343, 346 (2d Cir. 2003). We can think of no reason why those costs would be subject to a proximate-cause limitation but not the very similar costs specified in the preceding subsections of the statute.

A more difficult question is what "proximate cause" actually means. The term seems to have been around forever. See, e.g., *Peters v. Warren Ins. Co.*, 39 U.S. 99, 108 (1840). Cardozo in *Palsgraf v. Long Island R.R.*, 162 N.E. 99, 100-01 (N.Y. 1928), defined it as the foreseeability of the act alleged to have inflicted compensable harm. That definition failed to catch on, although foreseeability is acknowledged to be a relevant consideration, as we'll see shortly. The conventional definition of proximate cause was and remains "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Spicer v. Osunkoya*, 32 A.3d 347, 351 (Del. 2011); see also *State v. Jackson*, 697 S.E.2d 757, 759 (Ga. 2010); *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 666 (8th Cir. 2009); *Pickett v. RTS Helicopter*, 128 F.3d 925, 929 (5th Cir. 1997). What "natural" and "continuous" and "unbroken" and "efficient" and "intervening" mean in the context of determining legal responsibility for a harm remains, after centuries, unclear.

The current edition of *Black's Law Dictionary* (9th ed. 2009) attempts an updating: it defines proximate cause as "1. A cause that is legally sufficient to result in liability; an act or omission that is considered in law to result in a consequence, so that liability can be imposed on the actor," or "2. A cause that directly produces an event and without which the event would not have occurred." *Id.* at 250. The first definition begs the question ("legally sufficient to result in liability") and the second founders on the uncertain meaning of "directly."

All that "proximate cause" does as a practical matter is require a court to have a reason for picking out one causal relation among the many that may have contributed to an untoward event, a reason such that making that relation a basis of legal liability would have a socially desirable effect, such as deterrence. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 269-70 (1992). In *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 756 (7th Cir. 2011), we examined the various kinds of "work" done by "proximate cause" (the flip side— "remote causation"—the set of causes that shouldn't give rise to legal liability—might be a clearer name for a doctrine that places limits on the scope of liability). We said that it "protects the ability of primary victims of wrongful conduct to obtain compensation; simplifies litigation; recognizes the limitations of deterrence (unforeseeable consequences of a person's acts will not influence his decision on how scrupulously to comply with the law); and eliminates some actual or possible but probably minor causes as grounds of legal liability." Suppose the defendant didn't upload the images he possessed of Amy and Vicky to the Internet, and someone stole them by hacking into his computer and the hacker uploaded them—that would be an unforeseeable consequence of the defendant's crime for which presumably he would not be liable because imposing liability for unforeseeable consequences of one's criminal acts is unlikely to deter those acts. And likewise if Amy or Vicky had lost income because her psychological trauma had caused her to have to reschedule a job interview, and in the interim the job was filled. Cf. *Guth v. Tazewell County*, No. 11-3452, 2012 WL 4901159, at *5 (7th Cir. Oct. 17, 2012);

*Movitz v. First National Bank*, 148 F.3d 760, 763-64 (7th Cir. 1998).

But we don't have to get deeper into the proximate-cause briar patch. Before a judge gets to the issue of proximate cause, he has to determine *what* the defendant caused. Amy's and Vicky's brief misses this point in stating (a proposition not wholly true, but we'll ignore that qualification) that "a tortfeasor cannot say he should escape liability for sinking a barge because someone else's acts would have sunk the barge regardless." The statement is an allusion to a discussion in W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 52, p. 347 (5th ed. 1984), of a class of tort cases best illustrated by cases concerning not barges but "multiple fires of negligent origin. If each fire would have destroyed the plaintiff's property, so that all the fires were sufficient conditions of the harm but none was a necessary condition, nevertheless the firemakers would be jointly liable whether or not they were acting in concert." *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011). Otherwise there would be two wrongdoers, a harm from the wrongdoing—yet no liability.

Is this such a case? Amy's and Vicky's brief states that "apportioning [their] harm among the numerous past, present, and future defendants is all but impossible. But all of them have contributed to Amy and Vicky's images going 'viral' on the internet." It's an open question whether the defendant in the present case uploaded any of Amy's and Vicky's images to the Internet—if he didn't, then he didn't contribute to those images "going

viral." If we consider only his having seen those images, and imagine his being the only person to have seen them, Amy's and Vicky's losses would not have been as great as they were. Think of Vicky's stalker, whose stalking of her, inspired by seeing her pornographic images, caused significant psychological harm that could not be attributed to the defendant in this case to the slightest degree if he never uploaded any of her images.

But we learn from the government's post-argument submission that the defendant may have uploaded the images of Amy and Vicky after all, and thus have contributed to the victims' hurt—but how *much* he might have contributed to it in this way, who could say? All that's clear is that without a finding that he was a distributor, it is beyond implausible that the victims would have suffered the harm they did had he been the only person in the world to view pornographic images of them. The case must therefore be remanded for a redetermination not of the victims' total damages, which are conceded, but of the portion allocable to the defendant. This is the approach taken by all but one of the courts of appeals to have addressed the issue. *United States v. Burgess*, 684 F.3d 445, 460 (4th Cir. 2012); *United States v. Kearney*, 672 F.3d 81, 99-100 (1st Cir. 2012); *United States v. Aumais*, 656 F.3d 147, 154-55 (2d Cir. 2011); *United States v. Kennedy*, 643 F.3d 1251, 1264-65 (9th Cir. 2011); *United States v. Monzel*, 641 F.3d 528, 539-40 (D.C. Cir. 2011); *United States v. McDaniel*, 631 F.3d 1204, 1209 (11th Cir. 2011). (The outlier is *In re Unknown*, No. 09-41238, 2012 WL 4477444, at *21 (5th Cir. Oct. 1, 2012) (en banc).)

But suppose that on remand the judge finds that the defendant was a distributor after all. The apportionment problem would then be acute, maybe insoluble. When two or more tortfeasors, though not acting in concert, inflict a single loss as a result of their separate acts, they can be sued as joint tortfeasors and each made liable for the full amount of the plaintiff's loss—that's the two-fires case we mentioned earlier. (There really are such cases—e.g., A*nderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co.*, 179 N.W. 45, 49 (Minn. 1920).) The approach may be applicable to distributors of pornography (and if so, though it is a tort doctrine it could be adopted for criminal restitution) because it may be impossible as a practical matter to apportion liability among distributors. The number of pornographic images of a child that are propagated across the Internet may be independent of the number of distributors. A recipient of the image may upload it to the Internet; dozens or hundreds of consumers of child pornography on the Internet may download the uploaded image and many of them may then upload it to their favorite child-pornography web sites; and the chain of downloading and uploading and thus distributing might continue indefinitely. That would be like the joint-fire case.

But if the defendant in this case is not responsible for the viewing of the images of Amy and Vicky by even one person besides himself, joint liability would be inappropriate. Amy and Vicky argue that psychological harm is always "indivisible." But it isn't. If separate fires join and burn down the house, the harm is indivisible: the house is gone, and all the firemakers

are liable even though any one of the fires would have destroyed the house. And in our distribution example, the distributors may be jointly liable though again the entire harm might have occurred had there been only a single distributor. But often psychological harm can be greater or less, and it would have been less in this case if instead of tens of thousands of images of Amy's and Vicky's rapes being viewed on the Internet one image of each had been viewed by one person, the defendant.

The victims argue finally that imposing joint liability on the defendant is not a big hardship for him because he can seek contribution from the other viewers of the pornographic images. The judge made the defendant's liability "joint and several," which would indeed permit the defendant to seek contribution from the other contributors to Amy's and Vicky's losses. It is doubtful that the judge had the authority to do this. Contribution in a federal case normally and we assume in a criminal restitution case requires statutory authorization. See *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77, 95-99 (1981). The Criminal Victims' Rights Act states (in 18 U.S.C. § 2259(b)(2)) that an order of restitution under the Act shall be "enforced in accordance with section 3664," which is the general criminal restitution statute. That section authorizes the sentencing court to make liability for restitution joint and several "if the court finds that more than 1 defendant has contributed to the loss of a victim," 18 U.S.C. § 3664(h), and there is only one defendant in this case. So there is no statutory authorization for what the district judge did here.

We add that contribution in a case such as this would be extraordinarily clumsy, when one considers that in all likelihood all the defendants from whom restitution is being sought by Amy and Vicky are in prison and most of them have negligible assets to contribute to our defendant. On the basis both of practical considerations and the absence of statutory authorization, the Second Circuit in another case involving Amy held that contribution is not permissible unless the defendants from whom contribution is sought are defendants in the same case as the defendant seeking contribution. *United States v. Aumais*, *supra*, 656 F.3d at 155-56.

The district judge ordered the defendant to pay restitution from his prison wage at a rate of $100 a year. (We have said that the schedule of restitution payable before the defendant is released from prison should be left to the Bureau of Prisons to determine, *United States v. Sawyer*, 521 F.3d 792, 796 (7th Cir. 2008)—an issue on which the courts are divided, see, e.g., *United States v. Lemoine*, 546 F.3d 1042, 1048 and n. 4 (9th Cir. 2008)—but the government has not cross-appealed from the sentence.) It would make little sense to permit the defendant to sue other defendants for tiny shares of the amount of money that he is paying. True, there's always a chance of his winning a lottery or otherwise coming into money, all of which would be subject to being restitutioned away from him. But the chance is not large enough to justify the bother of awarding contribution rights to hundreds of prison inmates. We have enough inmate suits as it is.

To summarize: The defendant's prison sentence is affirmed. The calculation of the crime victims' losses is

affirmed too, except that the judge must determine how much to subtract from Amy's losses to reflect payments of restitution that she has received in other cases. The order of restitution is vacated and the case remanded for a redetermination of the amount of restitution owed by the defendant; that will require, besides the subtraction we just mentioned, a determination whether the defendant uploaded any of Amy's or Vicky's images. The defendant will not be permitted to seek contribution from other defendants convicted of crimes involving pornographic images of the two girls. And Amy and Vicky will not be permitted to intervene in the district court.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED WITH INSTRUCTIONS.